IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

RASHEAM HANSON ALEONG,　　　　　　　 )
　　　 *pro se* Plaintiff,　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　　　　 )
　　　　　　v.　　　　　　　　　　　　　　　 )　　　 Civil No. 3:17cv744 (JAG)
　　　　　　　　　　　　　　　　　　　　　　 )
NANCY A. BERRYHILL,　　　　　　　　　　 )
Acting Commissioner of Social Security,　　 )
　　　 Defendant.　　　　　　　　　　　　　　 )
_____ )

## REPORT AND RECOMMENDATION

On May 7, 2015, Rasheam Hanson Aleong ("Plaintiff") protectively applied for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the

Social Security Act ("Act"), alleging disability from diabetes, neuropathy, depression and nerve

damage, with an alleged onset date of April 28, 2015. The Social Security Administration

("SSA") denied Plaintiff's claims both initially and upon reconsideration. Thereafter, an

Administrative Law Judge ("ALJ") denied Plaintiff's claims in a written decision and the

Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final

decision of the Commissioner ("Defendant").

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g),

arguing that the ALJ erred by: (1) incorrectly affording weight to the medical opinions of

record; (2) overlooking the testimony of the vocational expert ("VE") in reaching his step-five

conclusion; and, (3) failing to order a neurological consultative examination. (Pl.'s Mot. Summ.

J. & Br. in Supp. Thereof ("Pl.'s Mem.") (ECF No. 18).) This matter now comes before the

Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties'

cross-motions for summary judgment, rendering the matter ripe for review.[1]  For the reasons that

follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 18) be

DENIED, that Defendant's Motion for Summary Judgment (ECF No. 19) be GRANTED and

that the final decision of the Commissioner be AFFIRMED.

## I.    PROCEDURAL HISTORY

On September 13, 2013, Plaintiff first filed an application for SSI and DIB, alleging

disability from diabetes with an alleged onset date of July 22, 2013.  (R. at 143-50, 346-53.)  The

SSA denied these claims on October 29, 2013, and Plaintiff did not request reconsideration.

(143-58.)  Plaintiff again applied for SSI and DIB on May 7, 2015, alleging disability from

diabetes, neuropathy, depression and nerve damage, with an alleged onset date of April 28, 2015.

(R. at 359, 365.)  The SSA denied Plaintiff's second claim on July 13, 2015, and again upon

reconsideration on November 2, 2015.  (R. at 159-94, 197-232.)  At Plaintiff's written request,

the ALJ held a hearing on April 25, 2016.  (R. at 79-127, 264-65.)  After ordering a consultative

examination, the ALJ held a supplemental hearing on March 13, 2017.  (R. at 40-78.)  On April

11, 2017, the ALJ issued a written opinion, denying Plaintiff's claims and concluding that

Plaintiff did not qualify as disabled under the Act, because he could perform jobs existing in

significant numbers in the national economy.  (R. at 17-31.)  On September 14, 2017, the

Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final

decision of the Commissioner subject to review by this Court.  (R. at 1-4.)

---

[1]      The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc.
R. 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any personal
identifiers such as Plaintiff's social security number, the names of any minor children, dates of
birth (except for year of birth), and any financial account numbers from its consideration of
Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to
only the extent necessary to properly analyze the case.

2

## II.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the

Social Security Administration's disability determination 'when an ALJ has applied correct legal

standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v.*

*Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d

337, 340 (4th Cir. 2012)).  Substantial evidence requires more than a scintilla but less than a

preponderance and includes the kind of relevant evidence that a reasonable mind could accept as

adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig*

*v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).  Indeed, "the substantial evidence standard

'presupposes . . . a zone of choice within which the decision makers can go either way, without

interference by the courts.  An administrative decision is not subject to reversal merely because

substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F.

App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir.

1988)).  To determine whether substantial evidence exists, the court must examine the record as

a whole, but may not "undertake to re-weigh conflicting evidence, make credibility

determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472

(quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).  In considering the decision of

the Commissioner based on the record, the court must "take into account whatever in the record

fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974)

(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).  The Commissioner's

findings as to any fact, if substantial evidence in the record supports the findings, bind the

reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*,

667 F.3d at 477.  If substantial evidence in the record does not support the ALJ's determination

or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*,

829 F.2d 514, 517 (4th Cir. 1987).

The Social Security Administration regulations set forth a five-step process that the

agency employs to determine whether disability exists. 20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential

evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity.

§§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical

impairments meet the regulations' severity and duration requirements. §§ 404.1520(a)(4)(ii),

416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments

meet or equal an impairment listed in the regulations. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

Between steps three and four, the ALJ must assess the claimant's residual functional capacity

("RFC"), accounting for the most that the claimant can do despite her physical and mental

limitations. §§ 404.1545(a), 416.945(a). At step four, the ALJ assesses whether the claimant

can perform her past work given her RFC. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Finally, at

step five, the ALJ determines whether the claimant can perform any work existing in the national

economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III.    THE ALJ'S DECISION

On April 25, 2016, the ALJ held a hearing during which Plaintiff (then-represented by a

non-attorney representative) and a VE testified. (R. at 79-127.) During the April 25 hearing, the

ALJ requested additional medical records and asked if Plaintiff would be willing to submit to a

consultative examination if the ALJ required one. (R. at 125-27.) The ALJ ordered a

consultative examination and Plaintiff's representative requested a supplemental hearing, which

4

the ALJ held on March 13, 2017.  (R. at 40-78.)  On April 11, 2017, the ALJ issued a written

opinion, finding that Plaintiff did not qualify as disabled under the Act.  (R. at 17-31.)

        The ALJ followed the five-step evaluation process established by the Social Security Act

in analyzing Plaintiff's disability claim.  (R. at 22-31.)  At step one, the ALJ found that Plaintiff

had not engaged in substantial gainful activity since April 28, 2015, Plaintiff's alleged onset

date.  (R. at 22.)  At step two, the ALJ held that Plaintiff had the following severe impairments:

diabetes mellitus, diabetic polyneuropathy,[2] cervical degenerative disc disease, cervical

myelopathy,[3] transverse myelitis,[4] cervical spinal cord lesion, hyperglycemia and depression.

(R. at 22.)  At step three, the ALJ concluded that Plaintiff did not have an impairment or

combination of impairments that met or medically equaled one of the listed impairments in 20

C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 23.)

        In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform sedentary work

with certain limitations.  (R. at 24.)  Plaintiff could occasionally climb ramps or stairs, but never

climb ladders, ropes or scaffolds.  (R. at 24.)  Plaintiff could occasionally balance, stoop, kneel,

crouch and crawl, and he could frequently reach, reach overhead, handle objects, and finger and

feel bilaterally.  (R. at 24.)  He could have occasional exposure to extreme heat, extreme cold,

wetness, humidity and vibration, but could not have exposure to very loud noises.  (R. at 24.)

---

[2]     Patients with polyneuropathy experience a functional disturbance or pathological change
in two or more of their peripheral nerves, affecting their ability to touch or feel.  *Neuropathy*,
Dorland's Illustrated Medical Dictionary (32d ed. 2012).

[3]     Patients with cervical myelopathy experience a compression of the cervical spinal cord,
causing various functional or pathological changes in the spinal cord.  *Myelopathy*, Dorland's
Illustrated Medical Dictionary (32d ed. 2012).

[4]     Transverse myelitis describes lesions that span across the spinal cord at a particular
location.  *Transverse Myelitis*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

The ALJ further limited Plaintiff to occasional exposure to pulmonary irritants such as dust, odors, fumes and gases. (R. at 24.) The ALJ also precluded Plaintiff from exposure to unprotected heights and hazardous machinery. (R. at 24.) The ALJ restricted Plaintiff to simple, routine and repetitive tasks not at a production-rate pace, and to simple, work-related decisions. (R. at 24.) And Plaintiff could have only occasional interaction with the public and frequent interaction with co-workers and supervisors. (R. at 24.) Ultimately, the ALJ determined that Plaintiff would be off task no more than 10 percent of the time in an eight-hour workday in addition to normal breaks. (R. at 24.)

At step four, the ALJ determined that Plaintiff could not perform any of his past relevant work. (R. at 29.) However, at step five, the ALJ determined that Plaintiff's age, education, work experience and RFC allowed him to perform jobs existing in significant numbers in the national economy, including work as a dowel inspector, weight tester and nut sorter. (R. at 30.) Therefore, the ALJ concluded that Plaintiff did not qualify as disabled under the Act. (R. at 31.)

### IV.    ANALYSIS

Plaintiff, forty-seven years old at the time of this Report and Recommendation, previously worked as a user support analyst, night auditor, loan processor, customer service clerk, dispatcher and insurance and benefits clerk. (R. at 29, 89-96.) He applied for DIB and SSI, alleging disability from diabetes, neuropathy, depression and nerve damage, with an alleged onset date of April 28, 2015. (R. at 159, 177.) Plaintiff appeals to this Court, contending that the ALJ erred by: (1) incorrectly affording weight to the medical opinions in the record; (2) overlooking the testimony of the VE in reaching his step-five conclusion; and, (3) failing to order a consultative examination of Plaintiff's neurological system. (Pl.'s Mem. at 1-2.) For the reasons set forth below, the ALJ did not err in his decision.

6

## A.   Substantial Evidence Supports the ALJ's Apportionment of Weight to the Medical Opinions of Record.

Plaintiff argues that the ALJ erred in incorrectly affording weight to the opinions of court-appointed experts and his treating physicians. (Pl.'s Mem. at 2.) Specifically, Plaintiff contends that the ALJ should have afforded greater weight to his treating and examining physicians than to the consultative physicians, who merely reviewed his medical records. (Pl.'s Mem. at 2.) Defendant responds that Plaintiff's treating physicians provided no opinion as to his functional limitations and that the ALJ properly explained his assignment of weight with respect to the other medical opinions. (Mem. Supp. Def.'s Mot. Summ. J. ("Def.'s Mem.") (ECF No. 20) at 18-20.) Thus, Defendant asserts that substantial evidence supports the ALJ's decision. (Def.'s Mem. at 20.)

During the sequential analysis, when the ALJ determines whether the claimant experiences a medically-determinable severe impairment, or combination of impairments, that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512, 404.1527, 416.912, 416.927. When the record contains several medical opinions that are consistent with each other, the ALJ decides based on that evidence. §§ 404.1527(c), 416.927(c). If, however, the medical opinions are inconsistent with each other or with other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. §§ 404.1527(c)(2)-(6), (d), 416.927(c)(2)-(6), (d).

7

Under the regulations, an ALJ may consider only an "acceptable medical source" as a treating source that offers an opinion entitled to controlling weight. SSR 06-03p.[5] Acceptable medical sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability. §§ 404.1513(a), 404.1527(a), 416.913(a), 416.927(a). A treating source's opinion must be given controlling weight if medically acceptable clinical and laboratory diagnostic techniques support it, and it comports with other substantial evidence in the record. §§ 404.1527(c)(2), 416.927(c)(2); *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017); *Craig*, 76 F.3d at 590; SSR 96-2p.[6] Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, such as when the source opines on the issue of disability (an issue reserved for the Commissioner), or when the treating source's opinion proves inconsistent with other evidence or when other evidence in the record does not strongly support the opinion. §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d).

The ALJ must also consider the opinions of any state agency consultants. State agency medical consultants are highly qualified physicians who are experts in Social Security disability evaluation. 20 C.F.R. §§ 404.1513a(b)(1), 416.913a(b)(1). Therefore, when considering the

---

[5]     Effective March 27, 2017, the SSA rescinded SSR 06-03p. Plaintiff filed his claim on May 7, 2015, before this regulation took effect. (R. at 359, 365.) The Agency does not have the power to engage in retroactive rulemaking. *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power). Because the regulation does not have retroactive effect, SSR 06-03p applies to Plaintiff's claim.

[6]     Effective March 27, 2017, the SSA rescinded SSR 96-2p, and it no longer applies the "treating physician rule." 20 C.F.R. § 404.1520c (2017). Under the new rule, the SSA will consider the persuasiveness of all medical opinions and evaluate them based upon two principal factors: supportability and consistency. §§ 404.1520c(a), (c)(1)-(2). Plaintiff filed his claim on May 7, 2015, before this regulation took effect. (R. at 359, 365.) As previously stated, the Agency does not have the power to engage in retroactive rulemaking. Thus, the Court will review the ALJ's decision under the old rule codified by 20 C.F.R. § 404.1527.

opinion of a state agency medical consultant, the ALJ must evaluate those findings just as he would for any other medical opinion. §§ 404.1513a(b)(1), 416.913a(b)(1). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ is required to explain the weight given to state agency opinions. §§ 404.1527(e), 416.927(e); *see also* §§ 404.1513a, 416.913a (setting forth rules applied to state agency medical and psychological consultants).

Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistences.'" *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). Indeed, an ALJ's decision regarding weight afforded a medical opinion should be left untouched unless the ALJ failed to give a sufficient reason for the weight afforded. *Id.*

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors. §§ 404.1527(c), 416.927(c). However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant qualifies as disabled as defined under the Act. §§ 404.1527(d)(1), 416.927(d)(1). Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors may be applied in evaluating opinion evidence from "other sources." SSR 06-03p.

Here, the record contains, and the ALJ considered, five medical opinions. (R. at 27-29.) The ALJ afforded limited weight to the opinion of Assad Meymandi, M.D., Ph.D., who evaluated Plaintiff in July 2015 at the request of Disability Determination Services. (R. at 27-28,

9

778.)  The ALJ afforded substantial weight to the opinions of Harkiran Grewal, M.D., who

conducted a court-ordered consultative examination of Plaintiff in November 2016, and Gary

Coleman, M.D., a state agency physician who reviewed Plaintiff's medical records.  (R. at 27-

28.)  The ALJ further afforded substantial weight to the opinions of Keith Noles, Ph.D., and

Aidaluz Tirado, Psy.D., two state agency psychologists who reviewed a "substantial portion" of

Plaintiff's medical records.  (R. at 28.)  For the reasons below, substantial evidence supports the

ALJ's assignment of weight to the medical opinions of record.

## 1.    The Record Contains No Opinion from a Treating Physician.

Although Plaintiff maintains that the ALJ failed to give weight to the opinions of his

treating physicians, the record reflects that there are no treating physician opinions for the ALJ to

afford weight.  (Pl.'s Mem. at 2.)  To consider a treatment record as a medical opinion, the

record must include opinions by the treating physician(s) about the nature and severity of a

plaintiff's impairments or his functional limitations.  *Elliot v. Astrue*, 2010 WL 545963, at * 4

(E.D. Va. Feb. 16, 2010).  Otherwise, a treatment record is simply objective medical evidence

that the ALJ need only consider along with all of the other evidence.  *Id.*  Plaintiff's treatment

records reveal that no acceptable treating source ever opined on the nature and severity of

Plaintiff's impairments or his functional limitations.

Plaintiff first sought treatment for diabetes on July 20, 2010, when he visited Hayden

Pasco, M.D., at Chesterfield Family Practice Center.  (R. at 512.)  Dr. Pasco noted that Plaintiff

had gained thirty to forty pounds in the preceding two years and that Plaintiff recognized the

need to lose weight.  (R. at 512.)  Plaintiff reported symptoms of type II diabetes, including

blurred vision, fatigue and weakness.  (R. at 512.)  Dr. Pasco's physical examination revealed no

apparent distress, with normal speech, affect, hearing and memory, and a regular heartrate and

10

good protective sensation on Plaintiff's feet. (R. at 513.)  Ultimately, Dr. Pasco called for more testing, a weight loss regimen and follow-up appointments. (R. at 514.)

On July 29, 2010, Plaintiff returned to Dr. Pasco for an evaluation of his type II diabetes. (R. at 509.)  Dr. Pasco's examination reported no evidence of headaches, weakness, numbness or falling. (R. at 509.)  Plaintiff also reported negative for suicidal thoughts, depression and anxiety. (R. at 509.)  Dr. Pasco did not opine about Plaintiff's functional capacity or the nature of Plaintiff's limitations.  Nor did Dr. Pasco describe specific functional limitations during Plaintiff's third appointment with him on August 13, 2010. (R. at 505-07.)

On September 1, 2010, Plaintiff presented to Patrick Mitchell, M.D., at Chesterfield Family Practice. (R. at 503.)  Dr. Mitchell observed that Plaintiff had not optimally controlled his diabetes to that point. (R. at 504.)  Dr. Mitchell called for better dietary control and more exercise to treat Plaintiff's diabetes, but did not specifically offer an opinion on how Plaintiff's condition limited his functional capacity. (R. at 503-04.)

Plaintiff next treated with a physician on June 28 and 29, 2012, when he saw Matthew Sarsfield, M.D., at Upstate University Hospital in Syracuse, New York. (R. at 515-23.)  Plaintiff complained of bowel problems, high blood sugar and anxiety. (R. at 515.)  Dr. Sarsfield reported no issues with Plaintiff's vision, feeling, breathing or nervous system. (R. at 515-16, 521.)  He further noted that Plaintiff did not require intervention for his mental health at that time. (R. at 516, 521.)

A year later, on July 31, 2013, Plaintiff visited WakeMed Emergency Services ("WakeMed") in Raleigh, North Carolina, complaining of elevated blood sugar. (R. at 557.)  Rodney L. McCaskill, M.D., W. John Wahba, P.A.C., and Elaine A. Swingle, R.N., all treated Plaintiff. (R. at 566.)  The treating professionals recorded that Plaintiff experienced occasional

11

bleeding of the gums and tingling in his feet, but noted that Plaintiff denied other symptoms of type II diabetes, such as blurred vision. (R. at 557.) Plaintiff also reported approximately one hundred and fifty pounds of involuntary weight loss in a nine-month period. (R. at 557.) Plaintiff's physical examination revealed no acute distress and intact motor and sensory functioning. (R. at 557-58.) The treating professionals further reported Plaintiff's mood and manner as "appropriate." (R. at 558.)

On September 19, 2013, Plaintiff returned to WakeMed, where Benjamin T. German, M.D., treated him. (R. at 538.) Plaintiff complained of non-traumatic feet pain. (R. at 538.) Dr. German provided no opinion on the nature and severity of Plaintiff's limitations. (R. at 538-51.) During his third visit to WakeMed on September 26, 2013, Plaintiff complained of difficulty urinating and high blood sugar. (R. at 525, 530.) Plaintiff's treating physician, Megan Cifuni, M.D., observed no abnormalities in Plaintiff's bodily systems, noting intact motor and sensory functions. (R. at 530-31.)

On January 13, 2015, Plaintiff treated with Kathryn M. Deplatchett, M.D., David R. Messerly, M.D., and Julie Ann Czech, M.D., at Rex Hospital in Raleigh, North Carolina. (R. at 575.) Plaintiff complained of high blood sugar and related symptoms. (R. at 576.) Dr. Deplatchett observed that Plaintiff's diabetes remained "uncontrolled" and that Plaintiff had not followed up with his endocrinologist. (R. at 580.) Plaintiff's physical examination revealed only mild distress, with otherwise normal systems. (R. at 582.) The next day, Dr. Messerly conducted a second evaluation of Plaintiff after he complained of chest pain. (R. at 584.) That examination revealed "no acute distress," normal affect and no signs of weakness. (R. at 585-86.) Dr. Messerly noted that Plaintiff's symptoms were "not an acute issue that need[ed] to be dealt with in the emergency department." (R. at 587.) Another physician, Jessica L. Virag,

12

M.D., also saw Plaintiff on January 14 and noted that Plaintiff exhibited normal mood and affect and no distress.  (R. at 589-90.)

Plaintiff returned to WakeMed on March 12, 2015, complaining of pain in both legs.  (R. at 615.)  Kimberly R. Singletary, M.D., and Melanie D. Elmore, P.A.C., treated Plaintiff and reported that he did not complain of weakness, calf swelling or pain.  (R. at 615-16.)  They also noted that Plaintiff appeared alert and oriented, with intact motor and sensory functions.  (R. at 616.)  Plaintiff denied feeling symptoms of depression.  (R. at 636-37.)  Dr. Singletary and Ms. Elmore counseled Plaintiff on the importance of monitoring his blood sugars and better managing his diabetes to mitigate any problematic symptoms.  (R. at 618.)  Neither professional discussed the nature or severity of Plaintiff's functional limitations or capacity.

On April 24, 2015, Plaintiff visited Duke Raleigh Hospital, complaining of right arm numbness, spasms and weakness.  (R. at 656.)  John M. Kelsch, Jr., M.D., examined Plaintiff and recorded no issues with his systems other than focal weakness, right arm weakness and paresthesia.[7]  (R. at 657.)  A computed tomography scan of Plaintiff's cervical spine also revealed only mild degeneration of Plaintiff's C6-C7 discs.  (R. at 669.)  Dr. Kelsch described Plaintiff as alert and oriented, with normal range of motion, coordination and affect.  (R. at 657.)

Four days later, on April 28, 2015, Plaintiff returned to Duke Raleigh Hospital, complaining of high blood sugar and frequent urination.  (R. at 699.)  Andrew T. Pickens, IV, M.D., treated Plaintiff and noted that all of his systems appeared negative for any problems.  (R. at 700.)  Dr. Pickens recorded Plaintiff as oriented and well-developed, with a normal range of motion and normal affect.  (R. at 701.)

---

[7]     Paresthesia describes an abnormal touch sensation, such as tingling or burning.  *Paresthesia*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

On May 28, 2015, one month after his alleged onset date, Plaintiff treated with Bradley J. Robottom, M.D., at Raleigh Neurology. (R. at 734.) Plaintiff complained of right arm numbness and spasms. (R. at 734.) Dr. Robottom described Plaintiff's diabetes as "very poorly controlled." (R. at 734.) In reviewing Plaintiff's systems, Dr. Robottom reported that Plaintiff complained of headaches, imbalance, dizziness, abnormal skin sensations, confusion, memory loss and involuntary movements. (R. at 735.) Plaintiff otherwise denied experiencing seizures, paralysis, tremors, tics or loss of consciousness. (R. at 735.) Plaintiff also denied depression or suicidal ideation. (R. at 735.) Dr. Robottom considered Plaintiff alert and oriented with intact sensation, but with decreased strength in his extremities and an ataxic gait. (R. at 737.) Dr. Robottom ordered a magnetic resonance imaging ("MRI") of Plaintiff's cervical spine, which Plaintiff underwent on June 2, 2015. (R. at 738, 741.) Michael L. Ross, M.D., performed the MRI and found an ovoid lesion on the upper right cervical spinal cord, which measured 1.9 centimeters in height and 1.2 centimeters across. (R. at 741.) Dr. Ross detected no other lesions or significant abnormalities. (R. at 741.) Dr. Ross did not opine about the lesion's impact on Plaintiff's functional limitations or capacity.

On June 9, 2015, Plaintiff underwent a second MRI, this time of his brain. (R. at 742.) Philip R. Saba, M.D., found that the spinal cord lesion revealed by the June 2 MRI likely indicated transverse myelitis and not multiple sclerosis.[8] (R. at 742-43.) Other than the lesion and some white matter, the MRI revealed no significant abnormalities. (R. at 742-43.)

Plaintiff visited Raleigh Neurology again on June 22, 2015, where he treated with Stacey P. Carroll, an adult nurse practitioner. (R. at 759.) Plaintiff complained of severe headaches that

---

[8]      On August 4, 2015, Plaintiff underwent a lumbar puncture that confirmed transverse myelitis as the cause of his spinal cord lesion. (R. at 802.)

14

prevented him from sleeping properly. (R. at 759.)  Ms. Carroll noted that diabetes likely caused

the white matter revealed in Plaintiff's brain MRI, and that the white matter did not cause

Plaintiff's symptoms. (R. at 762.)  During the appointment, Plaintiff denied experiencing

headaches, seizures, paralysis, imbalance, dizziness, confusion, memory loss, tics and

involuntary movements. (R. at 760.)  Ms. Carroll described Plaintiff as alert and oriented,

though his gait remained ataxic. (R. at 761.)  Ms. Carroll recommended physical and

occupational therapy, and prescribed a new drug regimen for Plaintiff's migraines. (R. at 762.)

On July 6, 2015, Plaintiff attended a physical and occupational therapy session at

WakeMed. (R. at 770.)  Plaintiff reported that he could not button his shirts or give himself

insulin injections. (R. at 772.)  Virginia B. Watson, P.T., recorded Plaintiff's gross motor skills

and sensation as impaired and opined that Plaintiff "is now unable to work, drive, or participate

in leisure/recreational activities previously enjoyed."[9] (R. at 775.)

On December 4, 2015, Plaintiff sought treatment at St. Mary's Hospital, complaining of

generalized weakness. (R. at 838.)  Robert G. Powell, M.D., treated Plaintiff and described him

as negative for numbness and headaches. (R. at 839.)  Dr. Powell noted that Plaintiff had

experienced unintentional weight loss and problems with frequent urination and dizziness. (R. at

839.)  Dr. Powell observed no behavioral problems and recorded that Plaintiff did not complain

of sleep disturbance. (R. at 839.)  Plaintiff appeared dehydrated, but Dr. Powell otherwise

described Plaintiff as alert and oriented, with a normal range of motion and normal mood and

---

[9]      Although Ms. Watson made statements about Plaintiff's functional capacity, the ALJ
need not assign Ms. Watson's opinion any weight, because a physical therapist does not
constitute an "acceptable medical source" under the regulations. 20 C.F.R. §§ 404.1513(a),
416.913(a); *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). Moreover, Ms. Watson's
conclusive opinion that Plaintiff could not work approaches the ultimate issue of disability — an
issue reserved to the Commissioner. §§ 404.1527(d), 416.927(d). Thus, the ALJ need not give
the opinion any weight.

affect. (R. at 840.) Plaintiff complained that he could not get the cap off his insulin syringes, though Plaintiff also admitted that he lost his insulin at somebody's house that week. (R. at 841-42.) Dr. Powell changed Plaintiff's diabetes diagnosis from type II to type I.[10] (R. at 855.) Ultimately, Dr. Powell discharged Plaintiff that same day after setting a follow-up appointment with an endocrinologist and recommending a consultation with a diabetes educator. (R. at 842, 855-56.)

Upon referral, Plaintiff next treated with William Purcell V, M.D., at St. Joseph's Outreach Clinic on December 14, 2015. (R. at 860.) Dr. Purcell noted symptoms of neuropathy in both of Plaintiff's legs, though his ankles did not appear swollen. (R. at 860.) Dr. Purcell considered Plaintiff alert, oriented and in no distress, reporting no discoloration of Plaintiff's extremities and normal coordination and gait. (R. at 861.) Dr. Purcell admonished Plaintiff that he had to better control his diabetes. (R. at 862.) Dr. Purcell did not opine about Plaintiff's functional limitations or capacity, nor did he offer an opinion when Plaintiff returned to see him on December 28, 2015. (R. at 873.)

Plaintiff visited with Dr. Purcell again on January 11, 2016. (R. at 883.) Plaintiff stated that he felt better after increasing his insulin dosage as instructed, though he still complained of pain in his hands. (R. at 883.) Dr. Purcell's examination revealed normal coordination and gait, normal extremities and coloration, and an otherwise "grossly normal" exam. (R. at 885.) Dr. Purcell advised Plaintiff to increase his insulin dosage even more. (R. at 886.)

On February 29, 2016, a second physician at St. Joseph's Outreach Clinic, Stephen J. Popovich, M.D., held an appointment with Plaintiff. (R. at 893.) Dr. Popovich noted that

---

[10]     Patients with type II diabetes mellitus can typically manage their diabetes with weight loss and diet control, whereas patients with type I diabetes mellitus require exogenous insulin. *Diabetes*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

16

Plaintiff required a larger dose of insulin to control his blood sugar. (R. at 893.) Plaintiff complained that the neuropathy in his hands made it difficult to inject insulin with needles. (R. at 894.) Plaintiff's gait and bodily systems all appeared normal. (R. at 895.)

Plaintiff again treated with Dr. Purcell on June 26, 2016. (R. at 974.) Plaintiff indicated that he had someone at home capable of injecting the insulin prescribed by Dr. Purcell and that he could inject himself in the thigh. (R. at 975.) However, Plaintiff had run out of insulin two weeks earlier. (R. at 975.) Physical examination of Plaintiff revealed normal neurological functioning and an alert and normal appearance, though Plaintiff experienced poor fine motor movement in his right hand. (R. at 976.) Dr. Purcell asked Plaintiff to come back in a few weeks with a completed application for the clinic's patient assistance program ("PAP"), which would help Plaintiff obtain insulin. (R. at 976.)

Several months later, on November 3, 2016, Plaintiff presented to St. Joseph's Outreach Clinic for a follow-up appointment. (R. at 988.) Plaintiff complained of muscle cramps, high blood sugar, fatigue, poor appetite and nausea. (R. at 988.) During the appointment, Plaintiff returned the PAP application that Dr. Purcell had given him in June. (R. at 988.) Nathan Owens, N.P., recorded that Plaintiff appeared weak but otherwise had no distress. (R. at 988.) Mr. Owens suspected that Plaintiff failed to take his insulin as prescribed, because the insulin given to him in June could have lasted only a little over a month. (R. at 990.) Mr. Owens recommended that Plaintiff revisit the emergency department at St. Mary's Hospital to address his high blood sugar. (R. at 990.) Mr. Owens did not discuss Plaintiff's functional limitations or capacity.

On December 12, 2016, Plaintiff returned to St. Joseph's Outreach Clinic, where Janet M. Eddy, M.D., treated Plaintiff for diabetic symptoms. (R. at 1001-02.) Dr. Eddy hypothesized

that Plaintiff might be afraid of needles, as he would not inject insulin anywhere but in his legs. (R. at 1003.) She believed that Plaintiff did not use insulin daily, as prescribed, even though Plaintiff's mother volunteered to help him with his injections. (R. at 1003.) Dr. Eddy also reported that Plaintiff likely failed to absorb the insulin that he did inject, because he injected it in the same place repeatedly. (R. at 1003.)

On December 28, 2016, Plaintiff revisited with Dr. Purcell after visiting the hospital for chest pain. (R. at 1010.) Plaintiff admitted that that he sometimes forgot to take insulin. (R. at 1012.) Plaintiff appeared alert, oriented and in no distress, with normal coordination and gait. (R. at 1013-14.) Dr. Purcell again reminded Plaintiff to take his insulin as prescribed. (R. at 1014.) Dr. Purcell did not opine about Plaintiff's functional limitations or capacity.

Finally, on January 16, 2017, Plaintiff presented to Dr. Eddy for a follow-up appointment and expressed that he felt better. (R. at 1021-23.) Plaintiff complained of poor appetite, though he ate two to three times a day. (R. at 1023.) Plaintiff also mentioned feeling depressed and withdrawn. (R. at 1023.) Dr. Eddy remarked that Plaintiff "generally look[ed] better." (R. at 1024.) Dr. Eddy did not offer an opinion on Plaintiff's functional limitations or capacity.

Given the above treatment history, the record stands devoid of any opinion from an acceptable treating source that required consideration by the ALJ. Every physician with whom Plaintiff treated described his condition and symptoms, but no physician ever specifically opined about how Plaintiff's conditions affected his functional capacity. Without any specific opinion from an acceptable medical treating source as to Plaintiff's functional limitations or capacity, the ALJ had no treating source opinion to assign weight. Therefore, the ALJ needed only to consider the treatment records as objective medical evidence along with the other evidence of record, which the ALJ did. (R. at 26-27.) Thus, the ALJ did not err.

18

## 2. Substantial Evidence Supports the Assignment of Limited Weight to Dr. Meymandi's Opinion.

Dr. Meymandi conducted a psychiatric evaluation of Plaintiff on July 8, 2015, at the request of North Carolina's Disability Determination Services. (R. at 778.) Dr. Meymandi briefly reviewed Plaintiff's records before interviewing Plaintiff for 40 minutes. (R. at 778.) In his opinion, Dr. Meymandi noted that Plaintiff had experienced symptoms of depression, dizziness, fatigue, loss of appetite, weight loss, sleep disturbances and headaches. (R. at 779.) Dr. Meymandi reported no evidence of psychosis, schizophrenia, hallucinations, delusions, obsessive-compulsive disorder or panic disorder in Plaintiff's medical history. (R. at 779.) Dr. Meymandi opined that Plaintiff had no hobbies, his personal habits had evidently deteriorated and that there was "no question" that Plaintiff suffered from depression, though not major depression. (R. at 780.) Dr. Meymandi also described Plaintiff as well-developed but poorly nourished and in psychiatric distress. (R. at 780-81.) Nonetheless, Plaintiff appeared alert and oriented with no signs of anxiety or agitation and an adequate fund of knowledge. (R. at 781.) Dr. Meymandi further remarked that Plaintiff's gait appeared unimpaired. (R. at 782.) Ultimately, Dr. Meymandi concluded that Plaintiff could "manage benefits in his own interest" but could not make an occupational adjustment. (R. at 783.) The ALJ afforded Dr. Meymandi's opinion limited weight, finding the opinion "vague, not in vocationally relevant terms, and not consistent with the overall record or with his own examination . . . ." (R. at 28.) Substantial evidence supports the ALJ's assignment of weight.

First, Dr. Meymandi's own evaluation contradicts his conclusory opinion that Plaintiff could not make an occupational adjustment. Despite his conclusions, Dr. Meymandi described Plaintiff as alert, oriented, cooperative and helpful. (R. at 780-81.) By Dr. Meymandi's own estimation, Plaintiff exhibited a "certainly adequate" fund of knowledge. (R. at 781.) Dr.

Meymandi also ruled out the possibility that Plaintiff suffered from psychosis, delusions or paranoia. (R. at 781-82.) And Dr. Meymandi found that Plaintiff could manage his interests. (R. at 783.) These findings contradict Dr. Meymandi's conclusory and vague opinion that Plaintiff could not make any occupational adjustment.

Dr. Meymandi's opinion also contradicts Plaintiff's treatment record. Although Plaintiff's one-time physical therapist reached a similar conclusory opinion to Dr. Meymandi, (R. at 775), no other treating source remarked that Plaintiff could not make an occupational adjustment. Plaintiff's treating physicians repeatedly described him as alert and oriented with normal motor functions and coordination. (R. at 513, 515, 530-31, 557-58, 582, 585-86, 589-90, 616, 657, 701, 737, 761, 840, 861, 885, 895, 988, 1013-14.) Plaintiff's physicians also frequently observed that Plaintiff appeared in a good mood and showed no signs of depression. (R. at 509, 516, 521, 558, 589-90, 636-37, 735, 839-40, 895, 976, 988, 1024.) Indeed, the record lacks any evidence that Plaintiff sought out comprehensive mental health treatment. And Plaintiff's symptoms often worsened when he failed to manage his diabetes. (R. at 504, 618, 734, 862, 883, 975-76, 990, 1003, 1012, 1023.) Thus, Dr. Meymandi's conclusion that Plaintiff could not adjust to any occupation lacks support from Plaintiff's treatment records.

Dr. Meymandi's opinion also lacks support from Plaintiff's hearing testimony. Specifically, Plaintiff testified to using a computer, sweeping, reading and shopping. (R. at 107-12.) Plaintiff stated that he often visited Walmart to socialize and had friends over. (R. at 54, 112.) Plaintiff also visited friends on occasion. (R. at 54.) He rode the train twice to attend hearings and testified to doing laundry and vacuuming. (R. at 47, 51.) Although denying that he cooked, Plaintiff attested that he often made sandwiches and other basic meals for himself. (R. at 51.) And Plaintiff stated that he often went on walks to pass the time, speaking with neighbors

20

along the way.  (R. at 52.)  These activities conflict with Dr. Meymandi's conclusion that Plaintiff could not make an occupational adjustment.

Finally, as the ALJ correctly noted, Dr. Meymandi provided only a vague and conclusory opinion.  Generally, an ALJ need not assign significant weight to a conclusory opinion that lacks support in the record.  20 C.F.R. §§ 404.1527(c)(2), (d)(2), 416.927(c)(2), (d)(2); *Koisch v. Astrue*, 650 F. Supp. 2d 475, 489 (E.D. Va. 2009).  Dr. Meymandi failed to provide any logical explanation for his conclusion that Plaintiff could not work and the record, including Dr. Meymandi's own notes, does not fill the void.  Thus, substantial evidence supports the ALJ's assignment of limited weight to Dr. Meymandi's opinion.

### 3.    Substantial Evidence Supports the ALJ's Assignment of Substantial Weight to the Opinion of Dr. Grewal.

Dr. Grewal evaluated Plaintiff on November 12, 2016.  (R. at 906.)  Dr. Grewal observed that Plaintiff could get on and off the exam table and up and out of a chair.  (R. at 907.)  He also noted that Plaintiff's gait appeared normal, though he lost balance when asked to walk on his heels.  (R. at 908.)  Plaintiff could write with a pen and had 5/5 strength in his upper and lower extremities.  (R. at 908.)  Dr. Grewal considered Plaintiff's diabetes "poorly controlled."  (R. at 908.)  Dr. Grewal opined that Plaintiff could frequently lift under twenty pounds, occasionally lift over twenty pounds and never lift over fifty pounds.  (R. at 910.)  Plaintiff could also write, pinch and grab a coin, and tie his shoe laces.  (R. at 911.)  Dr. Grewal recorded that Plaintiff could continuously reach overhead and handle objects, and could finger, feel, and push and pull bilaterally.  (R. at 912.)  Plaintiff could frequently operate foot controls with both feet.  (R. at 912.)  Dr. Grewal further stated that Plaintiff could handle occasional exposure to unprotected heights, moving parts, humidity, dust, extreme temperatures and vibrations, and that Plaintiff could frequently operate a motor vehicle.  (R. at 913.)  In an eight-hour workday, Dr. Grewal

21

believed that Plaintiff could sit for eight hours, stand for four hours and walk for three hours. (R. at 918.) And, by Dr. Grewal's estimation, Plaintiff did not require a cane to ambulate. (R. at 918.) The ALJ assigned substantial weight to Dr. Grewal's opinion overall, but he found that Plaintiff suffered from greater limitations than Dr. Grewal endorsed. (R. at 28.) Substantial evidence supports the ALJ's assignment of weight.

As mentioned, Plaintiff's treatment record is replete with evidence that supports Dr. Grewal's findings for the most part. Plaintiff's treating physicians repeatedly described him as alert and oriented with normal motor functions and coordination. (R. at 513, 515, 530-31, 557-58, 582, 585-86, 589-90, 616, 657, 701, 737, 761, 840, 861, 885, 895, 988, 1013-14.) His physicians also often described Plaintiff's gait as normal, improving after a brief decline in 2015. (R. at 557-58, 585-86, 657, 701, 737, 761, 840, 861, 885, 895, 1013-14.) And Plaintiff's longitudinal record shows that better management of his diabetes ameliorated many of his conditions. (R. at 504, 618, 734, 862, 883, 975-76, 990, 1003, 1012, 1023.) However, unlike Dr. Grewal's account, Plaintiff's record confirms a weakening of his extremities. (R. at 657, 734, 737, 772, 841, 860, 894, 976.) Plaintiff also testified to having greater limitations than Dr. Grewal afforded him, including poor motor function in his right hand. (R. at 48, 56, 109.) The ALJ acknowledged these discrepancies and found Plaintiff more limited than Dr. Grewal opined "in light of evidence showing muscle weakness and instability." (R. at 28.) Thus, substantial evidence in the record supports the ALJ's assignment of weight to Dr. Grewal's opinion.

### 4. Substantial Evidence Supports the ALJ's Assignment of Substantial Weight to Dr. Coleman's Opinion.

On October 15, 2015, Dr. Coleman reviewed Plaintiff's available record and provided a consultative opinion as to Plaintiff's functional limitations and capacity. (R. at 197-214.) Dr. Coleman reported that Plaintiff could occasionally lift twenty pounds and frequently lift ten

22

pounds. (R. at 206.) He also limited Plaintiff to standing and walking for a total of two hours

and sitting for a total of six hours in an eight-hour workday. (R. at 206.) Dr. Coleman opined

that Plaintiff could push and pull and operate hand and foot controls without limitation. (R. at

206.) By Dr. Coleman's estimation, Plaintiff could climb ramps and stairs frequently, but never

climb ladders, ropes or scaffolds. (R. at 206.) Plaintiff could also balance, stoop, kneel and

crouch frequently. (R. at 206.) Dr. Coleman limited Plaintiff's capacity to reach, handle, finger

and feel, stating that Plaintiff could frequently — but not continuously — perform those

functions. (R. at 207.) Based on these limitations, Dr. Coleman found that Plaintiff could

perform simple, routine tasks and adjust to stable work assignments in a non-production-oriented

environment. (R. at 210.) Dr. Coleman limited Plaintiff to unskilled and sedentary work. (R. at

213.) The ALJ assigned Dr. Coleman's opinion substantial weight, noting that Dr. Coleman

explained his conclusions and that his opinion conformed with the entire record. (R. at 28.)

However, given later evidence, the ALJ ultimately found Plaintiff more limited than Dr.

Coleman opined. (R. at 28.) Substantial evidence supports the ALJ's assignment of weight to

Dr. Coleman's opinion.

Dr. Coleman's opinion comports with the evidence of record. Again, Plaintiff's treating

physicians repeatedly described him as alert and oriented with normal motor functions and

coordination, which supports Dr. Coleman's finding that Plaintiff could frequently reach, finger

and handle objects. (R. at 206, 513, 515, 530-31, 557-58, 582, 585-86, 589-90, 616, 657, 701,

737, 761, 840, 861, 885, 895, 988, 1013-14.) Plaintiff's physicians also often described

Plaintiff's gait as normal, improving after a brief decline. (R. at 557-58, 585-86, 657, 701, 737,

761, 840, 861, 885, 895, 1013-14.) Plaintiff's own testimony further exhibited his capacity to

perform at least sedentary tasks, such as typing, and more active tasks, such as walking. (R. at

52, 108.) And evidence of Plaintiff's increased weakness supports the limitations that Dr.

Coleman endorsed, such as restricting Plaintiff to never climbing ladders, ropes and scaffolds.

(R. at 109, 206, 657, 734, 737, 772, 841, 860, 894, 976.)

While Dr. Coleman found Plaintiff capable of frequently climbing ramps and stairs and

frequently balancing, stooping, kneeling and crouching, the ALJ limited Plaintiff to occasionally

performing those functions based on evidence that accumulated after Dr. Coleman's 2015

opinion. (R. at 24, 28, 206.) Indeed, treatment records from late 2015 through 2017 show that

Plaintiff continued to experience neuropathy in his hands and legs, and he complained of muscle

cramps, fatigue and poor appetite. (R. at 861, 883, 893, 998, 1023.) Finally, Plaintiff's

treatment records show that his failure to properly manage his diabetes resulted in many of the

limitations that he experienced, confirming Dr. Coleman's opinion that better diabetes

management would mitigate many of Plaintiff's symptoms. (R. at 504, 618, 734, 862, 883, 975-

76, 990, 1003, 1012, 1023.) Substantial evidence therefore supports the ALJ's assignment of

substantial weight to Dr. Coleman's opinion.

### 5.    Substantial Evidence Supports the ALJ's Assignment of Substantial Weight to the Opinions of Drs. Noles and Tirado.

Dr. Noles and Dr. Tirado each provided a consultative assessment of Plaintiff's mental

functional capacity. Dr. Noles assessed Plaintiff on July 13, 2015, by reviewing Plaintiff's

records. (R. at 173.) Dr. Noles found that Plaintiff could remember locations, work-like

procedures and both simple and detailed instructions. (R. at 171.) Dr. Noles further found that

Plaintiff could perform activities within a schedule, maintain regular attendance, sustain a routine

without special supervision and work in coordination with others without distraction. (R. at

171.) Plaintiff could also make simple, work-related decisions. (R. at 171.) However, Dr. Noles

did find moderate limitation in Plaintiff's ability to carry out detailed instructions and to

24

concentrate for extended periods. (R. at 171.) Socially, Dr. Noles opined that Plaintiff had

moderate limitations in his ability to interact with the public and to respond appropriately to

criticism from supervisors, but that Plaintiff could also ask simple questions, request assistance

and get along well with co-workers and peers. (R. at 172.) Dr. Noles also observed that Plaintiff

had not sought treatment for his reported depression in quite some time and that his diabetes

caused most of his limitations. (R. at 173.) Ultimately, Dr. Noles found that Plaintiff had the

capacity to perform simple, routine and repetitive tasks at a non-production pace and in a

position with reduced social demands. (R. at 173.)

Dr. Tirado assessed Plaintiff's records on October 20, 2015, at the reconsideration stage

and reached similar conclusions to Dr. Noles. (R. at 211-12.) Dr. Tirado noted that Plaintiff had

not sought treatment for mental health issues since the initial review by Dr. Noles. (R. at 211.)

With no additional evidence to consider, and finding no issue with the initial assessment, Dr.

Tirado affirmed Dr. Noles's findings. (R. at 211.) The ALJ afforded substantial weight to the

opinions of Drs. Noles and Tirado, remarking that they comported with the overall evidence of

record. (R. at 28.) The ALJ recognized that Drs. Noles and Tirado based their opinions on

since-revised criteria[11] but found that their assessments remained consistent with the revisions,

---

[11]     Instead of requiring, as in listing 12.04, both (A) medical documentation of an
enumerated mental disorder and either (B) marked or extreme limitations in certain mental
functions or (C) evidence of seriousness/persistence, the ALJ noted that the revised mental RFC
assessment criteria align more closely with the old "paragraph B" criteria. (R. at 23.) That is,
examiners should determine whether a claimant's mental impairment results in at least one
extreme limitation or two marked limitations in four broad areas of mental functioning, namely:
(1) understanding, memory, or application of information; (2) interaction with others; (3)
concentration, persistence or maintenance of pace; and, (4) adaptation or management of oneself.
Because Drs. Noles and Tirado considered these criteria, the ALJ found their opinions probative.
(R. at 28, 171-73, 211-12.)

25

thus rendering the opinions probative. (R. at 28.) Substantial evidence supports the ALJ's assignment of weight.

Plaintiff's treatment record shows that Plaintiff had the capacity to work with others, remember directions and complete simple tasks. Plaintiff's treating physicians repeatedly remarked that Plaintiff showed normal affect, memory and mood. (R. at 509, 513, 516, 521, 530-31, 557-58, 585-86, 589-90, 616, 657, 701, 761, 839-40, 861, 885, 895, 976, 988, 1013-14.) They also documented Plaintiff's normal coordination and motor skills, despite Plaintiff's extremities weakening somewhat. (R. at 513, 515, 530-31, 557-58, 582, 585-86, 589-90, 616, 657, 701, 737, 761, 840, 861, 885, 895, 988, 1013-14.) Plaintiff also showed no acute symptoms of depression over the course of his treatment. (R. at 509, 516, 521, 636-37, 735.) Indeed, Plaintiff never made a concerted effort to treat his mental impairments. Plaintiff's final treatment record does document that Plaintiff complained of depression, but Plaintiff also reported feeling better overall. (R. at 1023.) And even Dr. Meymandi, who concluded that Plaintiff suffered from depression, observed that Plaintiff generally had a good, cooperative mood and a good fund of knowledge. (R. at 780-81.) The record also reflects that Plaintiff's mental condition improved with better management of his diabetes. (R. at 883, 1023.)

Drs. Noles and Tirado's opinions further comport with Plaintiff's hearing testimony. Plaintiff testified to using a computer, sweeping, reading and shopping. (R. at 107-12.) Plaintiff also stated that he often visited Walmart to socialize. (R. at 112.) He stated that friends visited him, and that he occasionally visited his friends. (R. at 54.) He also spoke with neighbors while on walks and could make basic meals. (R. at 51-52.) These activities demonstrate Plaintiff's ability to work with others and complete simple tasks at a non-production rate.

26

Substantial evidence from Plaintiff's treatment records and hearing testimony therefore supports the ALJ's assignment of weight to the opinions of Drs. Noles and Tirado.

**B.      The ALJ Properly Based His Step-Five Conclusion on the VE's Testimony.**

Plaintiff contends that the ALJ overlooked the VE's testimony that Plaintiff had severe limitations in his ability to work when concluding that Plaintiff could perform jobs in the national economy. (Pl's Mem. at 1.)  The Court interprets this argument as a challenge to both the ALJ's RFC findings and the ALJ's step-five conclusion that Plaintiff could perform jobs existing in significant numbers in the national economy, for if the VE's testimony is based on an incorrect or incomplete RFC, it cannot support the ALJ's step-five conclusion. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Hines v. Barnhart*, 453 F.3d 559, 567 (4th Cir. 2006) (finding that VE's testimony had no value, because he did not take all of the claimant's impairments into account).  Defendant counters that substantial evidence supports both the ALJ's RFC and step-five determinations. (Def.'s Mem. at 16-21.)

**1.      Substantial Evidence Supports the ALJ's RFC Findings.**

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC.  20 C.F.R. §§ 404.1520(e)-(f), 404.1545(a)(1), 416.920(e)-(f), 416.945(a)(1).  The claimant's RFC must incorporate impairments supported by the objective medical evidence in the record, as well as those impairments based on the claimant's credible complaints. *Carter v. Astrue*, 2011 WL 2688975, at *3 (E.D. Va. June 23, 2011); *accord* 20 C.F.R. § 416.945(e).  The ALJ "must first identify the [claimant]'s functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions listed in the regulations." *Mascio*, 780 F.3d at 636 (citing SSR 96-8p).  The ALJ's RFC "assessment must include a

narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations)." *Id.* (citing SSR 96-8p).

The Court will uphold the ALJ's RFC findings if substantial evidence in the record supports the findings and the ALJ has applied the correct legal standards in reaching them. *Hancock*, 667 F.3d at 472. "A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling. The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). The Court will "remand to the agency for additional investigation or explanation when we cannot evaluate the record of the basis that underlies the ALJ's ruling." *Fox v. Colvin*, 632 F. App'x 750, 756 (4th Cir. 2015) (quoting *Radford*, 734 F.3d at 295).

Here, the ALJ found that Plaintiff had the RFC to perform sedentary work with additional limitations. (R. at 24.) The ALJ limited Plaintiff to frequent pushing and pulling and frequent operation of foot and hand controls with his upper and lower extremities. (R. at 24.) The ALJ also found that Plaintiff could only occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, and occasionally balance, stoop, kneel, crouch and crawl. (R. at 24.) The ALJ further restricted Plaintiff to only frequent reaching, reaching overhead, handling of objects, and fingering and feeling bilaterally. (R. at 24.) And Plaintiff could have only occasional exposure to extreme temperatures, humidity, vibrations, pulmonary irritants and loud noises. (R. at 24.) Plaintiff could never have exposure to very loud noise and workplace hazards like unprotected heights and hazardous machinery. (R. at 24.) Ultimately, the ALJ found that Plaintiff had the RFC to complete simple, routine and repetitive tasks, not a production-rate pace,

and to make simple, work-related decisions. (R. at 24.) Socially, the ALJ considered Plaintiff capable of occasional interaction with the public and frequent interaction with co-workers and supervisors. (R. at 24.) In an eight-hour workday, the ALJ estimated that Plaintiff would be off task no more than 10 percent of the time with normal breaks. (R. at 24.) Substantial evidence sustains the ALJ's RFC findings.

As required by law, the ALJ reached his RFC findings after explaining which evidence the ALJ found credible and why. *Radford*, 734 F.3d at 295. The ALJ considered the objective medical evidence and medical opinions of record, as well as Plaintiff's subjective complaints. (R. at 25-29.) The medical evidence of record supports the ALJ's RFC determination. As previously discussed, Plaintiff's treatment record is replete with evidence that Plaintiff had normal gait, bodily functions, motor skills and orientation. (R. at 509, 513, 516, 521, 530-31, 557-58, 585-86, 589-90, 616, 657, 701, 761, 839-40, 861, 885, 895, 976, 988, 1013-14.) Plaintiff also showed no acute symptoms of depression over the course of his treatment. (R. at 509, 516, 521, 636-37, 735.) Plaintiff's own testimony further exhibited his capacity to perform at least sedentary tasks, such as typing. (R. at 108.) And evidence of Plaintiff's increased weakness supports the ALJ's ultimate finding that Plaintiff could perform only sedentary work. (R. at 109, 657, 734, 737, 772, 841, 860, 894, 976.) Ultimately, Plaintiff's condition improved with better management of his diabetes, demonstrating that he could adjust to a work environment with consistent treatment. (R. at 504, 618, 734, 862, 883, 975-76, 990, 1003, 1012, 1023.)

The ALJ's RFC also comports with the medical opinions to which the ALJ assigned substantial weight. As discussed, substantial evidence supports the ALJ's assignment of substantial weight to the opinions of Drs. Grewal, Coleman, Noles and Tirado. The ALJ used

these opinions to formulate Plaintiff's RFC, and the RFC ultimately reflects the opinions. Like Dr. Grewal, the ALJ's RFC found that Plaintiff could frequently operate foot controls with both feet. (R. at 24, 912.) The ALJ also agreed with Dr. Grewal that Plaintiff could have only occasional exposure to extreme temperatures, humidity and vibrations. (R. at 24, 913.) But the ALJ assigned greater limitations to Plaintiff than Dr. Grewal, properly explaining why. (R. at 28.) The ALJ's RFC findings also comport with the opinion of Dr. Coleman, agreeing that Plaintiff could push/pull and operate foot and hand controls with little limitation. (R. at 24, 206.) Plaintiff's RFC further reflected Dr. Coleman's opinion that Plaintiff could frequently reach, handle objects, finger and feel bilaterally. (R. at 24, 207.) And the ALJ's RFC concurs with Dr. Coleman's conclusion that Plaintiff could perform sedentary work with simple, routine tasks at a non-production pace. (R. at 24, 213.) Finally, the ALJ's RFC findings reflect the opinions of Drs. Noles and Tirado. The ALJ adopted Drs. Noles and Tirado's findings regarding Plaintiff's social capacity, limiting Plaintiff to only occasional interaction with the public and frequent interaction with co-workers and supervisors. (R. at 24, 172-73, 211.)

In formulating Plaintiff's RFC, the ALJ complied with the requirement that he explain which evidence he gave credibility and why. The ALJ's findings also coincide with the medical opinions that the ALJ assigned the greatest weight and the medical evidence of record. Thus, the ALJ applied the correct legal standards and substantial evidence supports the RFC.

## 2.   The ALJ's Step-Five Decision Relied on Appropriate Hypotheticals.

At the fifth step of the sequential analysis, the Commissioner must show that, considering the claimant's age, education, work experience and RFC, he could perform other work that exists in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner can carry her burden at the last step with the testimony of a VE. *Walker,* 889

F.2d at 50. During the VE's testimony, the ALJ must pose hypothetical questions that accurately represent the claimant's RFC based on all of the record evidence and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Id.* Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.*; *see also Hines,* 453 F.3d at 567 (finding that the VE's testimony had no value, because he did not take all the claimant's impairments into account). Here, the ALJ relied on the testimony of VE Theodore Sawyer, Jr., to reach his step-five conclusion. (R. at 69.) Thus, the Court will consider the hypotheticals posed to Mr. Sawyer.

In his first hypothetical, the ALJ asked Mr. Sawyer if someone of Plaintiff's age, education and work experience with the same RFC — excluding limitations relating to environmental exposure — could perform jobs existing in the national economy. (R. at 71-72.) Mr. Sawyer listed the jobs of dowel inspector, weight tester and nut sorter — all of which had at least 15,000 jobs in the national economy. (R. at 72.) The ALJ then asked Mr. Sawyer to consider the same individual from his first hypothetical, but added that the individual had the capacity to handle only occasional exposure to extreme cold, extreme heat, wetness, humidity and loud noise, no exposure to very loud noise, and only occasional exposure to pulmonary irritants. (R. at 72-73.) With these additional limitations, the second hypothetical individual embodied the ALJ's ultimate RFC findings. (R. at 24.) The ALJ asked whether this assumed individual could perform the jobs that Mr. Sawyer listed in his answer to the first hypothetical. (R. at 73.) Mr. Sawyer responded that such an individual could perform those same jobs. (R. at 73.)

31

The record shows that the ALJ posed a hypothetical to the VE that properly reflected the ALJ's RFC findings. Because substantial evidence supports the ALJ's RFC assessment, and the second hypothetical posed to Mr. Sawyer mirrored the RFC, the ALJ properly relied on Mr. Sawyer's testimony as the basis for his step-five determination that Plaintiff could perform jobs existing in significant numbers in the national economy. (R. at 24, 30, 72-73.) Accordingly, the ALJ did not err in his step-five determination.

### C.     The ALJ Did Not Err by Failing to Order a Neurological Examination.

Plaintiff contends that the ALJ also erred in failing to order an additional neurological examination, which Plaintiff alleges the ALJ promised to order. (Pl.'s Mem. at 1.) Defendant does not specifically respond to this allegation but argues that substantial evidence supports the ALJ's RFC findings. (Def.'s Mem at 16-20.) The undersigned finds that the ALJ did not err, because Dr. Grewal conducted an examination of Plaintiff's neurological capacity at the ALJ's request and the provision of additional medical evidence to the ALJ after the first hearing obviated the need for further development of the record.

Although the ALJ must make a reasonable inquiry into a claim of disability, the ALJ has no duty to "go to inordinate lengths to develop a claimant's case." *Thompson v. Califano*, 556 F.2d 616, 618 (1st Cir. 1977). The ALJ must inquire into issues necessary for adequate development of the record, but "the ALJ is not required to function as the claimant's substitute counsel." *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994). The Fourth Circuit has explained that "the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when the evidence is inadequate" to determine whether the claimant is disabled. *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). Thus, the need to develop the

32

record is triggered when there is insufficient or inconsistent evidence.  20 C.F.R. §§ 404.1520b, 416.920b.  Discretion lies with the ALJ to determine whether to further develop the record or seek additional information from medical sources.  §§ 404.1520b(b), 416.920b(b).

Under the applicable regulations, an ALJ may procure a consultative examination for the claimant when the record must be further developed to seek additional information or resolve inconsistencies.  §§ 404.1519, 416.919.  Determinations to purchase a consultative examination are made on an individual basis, in accordance with the provisions provided in 20 C.F.R. §§ 404.1519a-f, 416.919a-f.  The regulations provide that consultative examinations may be purchased where the claimant's medical records are insufficient.  §§ 404.1519a, 416.919a. Further, a consultative examination may be sought "to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow [the ALJ] to make a determination or decision on [a claimant's] claim."  §§ 404.1519a(b), 416.919a(b).

Here, the ALJ informed Plaintiff at the end of his initial hearing that the ALJ might order a neurological examination after reviewing additional medical records.  (R. at 126.)  The ALJ did not order an examination at that time, but spoke with Plaintiff's representative about the need for more medical evidence on the issue of Plaintiff's neurological condition.  (R. at 126.) Ultimately, the ALJ ordered a consultative examination, which Dr. Grewal performed on November 12, 2016.  (R. at 924.)  Dr. Grewal's examination provided an overview of Plaintiff's physical capacity, including his neurological functioning.  (R. at 926.)  Dr. Grewal observed Plaintiff's capacity to finger, feel and handle objects, which indicated Plaintiff's neurological health.  (R. at 919, 926.)  Dr. Grewal also described Plaintiff's strength, cranial nerve condition and mental activity.  (R. at 926.)  Although Dr. Grewal's examination covered more than

33

Plaintiff's neurological system, it supplemented the ALJ's understanding of Plaintiff's conditions.

The ALJ also gained access to more records following Plaintiff's initial hearing that precluded the need for a detailed consultative examination of Plaintiff's neurological system. During the initial hearing, the ALJ did not have records past December 2015, which excluded records of Plaintiff's nine appointments at St. Joseph's Outreach Clinic. (R. at 125.) These appointments included observations of Plaintiff's ongoing neurological developments, which the ALJ considered in his opinion. (R. at 26; *see* R. at 860-61 (grossly normal neurological examination), 873 (complaining of altered sensation in hands and legs with burning pain, but otherwise appearing alert and oriented), 883 (continuing to experience aching hands), 885 (grossly normal neurological examination), 894-95 (grossly intact neurological examination), 976 (displaying poor fine motor movement of right hand, but otherwise appearing alert and oriented, 1013-14 (grossly normal neurological exam); 1024 (reporting no neurological issues).)

Because Dr. Grewal evaluated Plaintiff's neurological condition at the ALJ's request and because the record contained sufficient evidence to obviate the need for further examinations, Plaintiff's contention that the ALJ erred by failing to order a neurological examination lacks merit. Accordingly, the ALJ did not err.

## V.   CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 18) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 19) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to United States District Judge John A. Gibney, all counsel of record and the *pro se* plaintiff at his address of record.

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

/s/
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  October 1, 2018